**CONSUMERS UNION OF UNITED STATES, INC., Plaintiff-Appellant,**

v.

**John C. SAWHILL, Administrator of Federal Energy Administration, Defendant-Appellee.**

**No. DC–26.**

Temporary Emergency Court of Appeals.

Feb. 18, 1975.

Rehearing En Banc Granted March 19, 1975.

**1114**

Peter H. Schuck, Washington, D. C., for appellant.

Carla A. Hills, Asst. Atty. Gen., New York City, Stanley D. Rose and C. Max Vassanelli, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before TAMM, Chief Judge, and ANDERSON and JOHNSON, Judges.

ROBERT P. ANDERSON, Judge.

Consumers Union of the United States, Inc. (Consumers Union) alleges in this action that regulations, 10 C.F.R. §§ 212.71–74, effective January 15, 1974, issued by the Federal Energy Office, now the Federal Energy Administration (FEA), violate § 4 of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751–756 (the Act). Specifically, Consumers Union claims that § 4 of the Act imposes a mandatory duty to establish controls which will ensure "equitable" prices for all domestic crude oil; that FEA, by permitting new and released crude oil to be sold at the free market price violates such statutory duty and has in effect created a massive unauthorized exemption from the Act.

The United States District Court for the District of Columbia denied Consumers Union's motion for declaratory and injunctive relief and granted FEA's cross-motion for summary judgment. It held that the Act does not necessitate price ceilings, and that FEA's decision to let the prices "float" on certain categories of crude oil satisfies the statutory prescription that it specify or prescribe a manner for determining price. The court further ruled that this decision does not result in an invalid exemption from regulation, because all oil remains "subject to" allocation and price controls. Consumers Union has appealed from the decision and order of the district court.

The parties concede that the Act imposes a mandatory duty to "specify" or "determine," i. e. to "regulate" prices for all crude oil. The Act provides that the President of the United States ". . . shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts . . . and at prices specified in (or determined in a manner prescribed by) such regulation."

Section 4(a), in which this requirement is found, also specifies that the implementing regulation ". . . shall apply to all crude oil . . . produced in or imported into the United States,"[1] with one exception—"stripper well production," essentially the output of low-yield properties.[2] It is further provided that, ". . . to the maximum extent practicable," the regulation secure ". . . [the] preservation of an economically sound and competitive petroleum industry . . . equitable distribution . . . at equitable prices [and] . . . minimization of . . . unnecessary interference with market mechanisms." § 4(b)(1)(A–I).[3]

To exempt any category of crude oil from the allocation and pricing system, the President must make specific factual findings which, together with the proposed exemption, shall then be submitted to Congress. The exemption takes effect within a specified period thereafter, provided that neither House meanwhile takes any action expressing its disapproval. Any exemption thereby created may remain valid for a period not in excess of 90 days. § 4(g)(2).[4]

1. Section 4(a) provides:

"Not later than fifteen days after the date of enactment of this Act, the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. Subject to subsection (f), such regulation shall take effect not later than fifteen days after its promulgation. Except as provided in subsection (e) such regulation shall apply to all crude oil, residual fuel oil, and refined petroleum products produced in or imported into the United States."

2. Section 4(e)(2)(A) provides:

"The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well."

3. Section 4(b)(1) provides:

"The regulation under subsection (a), to the maximum extent practicable, shall provide for—
(A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;
(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);
(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;
(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;
(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;
(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;
(H) economic efficiency; and
(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms."

4. Section 4(g)(2) provides:

"If at any time after the date of enactment of this Act the President finds that application of the regulation under subsection (a) to crude oil, residual fuel oil, or a refined petroleum product is not necessary to carry out this Act, that there is no shortage of such oil or product, and that exempting such oil or product from such regulation will not have an adverse impact on the supply of any other oil or refined petroleum products subject to this Act, he may prescribe an amendment to the regulation under subsection (a) exempting such oil or product from such regulation for a period

The regulations in question establish a "two-tier pricing system," which impose ceilings on certain categories of crude oil while other categories may sell *at the market price.* Specifically, "old" oil, i. e. oil from properties producing at, or less than, their 1972 levels, cannot be sold at a figure which exceeds the highest posted price for the same grade of crude oil in that particular field on May 15, 1973, plus $1.35. The national average ceiling price for all old crude, which constitutes 60% of domestic production, is approximately $5.35 per barrel.

"New" crude oil, which is the amount of domestic crude oil produced and sold from a property above the amount produced and sold from that property during an equivalent period in 1972, "the base year," may be sold, under the regulations, without regard to the ceiling price, i. e. at the market price. 10 C.F.R. § 212.74(a). If a particular property did not produce at all during the base year, then all of its current yield is new oil

and, accordingly, may be sold at the market price. The prevailing national average price for new oil is approximately $10 per barrel.

"Released" oil constitutes that portion of the output of a particular property producing in excess of its 1972 level which is not "new" oil; that is to say, if the 1972 production level for a particular property is presently exceeded for an equivalent period, the current yield up to the base period production level is labeled "released crude" oil and the balance or excess over that level is "new crude" oil. The maximum allowable price for released oil is the lesser of the current market price or the price derived from a formula made up of the base period production level, the May 15, 1973 posted price, the current market price, and the amount by which present production exceeds base period yield, as delineated in the regulation. 10 C.F.R. § 212.74(b).[5]

of not more than ninety days. The President shall submit any such amendment and any such findings to the Congress. An amendment under this paragraph may not exempt more than one oil or one product. Such an amendment shall take effect on a date specified in the amendment, but in no case sooner than the close of the earliest period which begins after the submission of such amendment to the Congress and which includes at least five days during which the House was in session and at least five days during which the Senate was in session; except that such amendment shall not take effect if before the expiration of such period either House of Congress approves a resolution of that House stating in substance that such House disapproves such amendment."

5. The formula set out in 10 C.F.R. § 212.-74(b) is as follows:

$$\text{"}P_{max} = P_c + \left\{ \frac{C_{pr}}{C_{bpcl}} - 1 \right\} \left\{ P_m - P_c \right\}$$

Where:

P max   = Maximum price that may be charged for the crude petroleum (other than new crude) purchased from the property (dollars per barrel);

$P_c$   = Ceiling price of the crude petroleum (dollars per barrel);

$C_{bpcl}$ = Base production control level for property (barrels);

$C_{pr}$ = Total amount of crude petroleum produced from the property during the month (barrels), less the number of barrels of new crude petroleum required to be sold during the month at or below the ceiling price pursuant to the second sentence of paragraph (a) of this section; and

$P_m$ = Current free market price of the particular quality and grade of crude petroleum (dollars per barrel).

*Application of this formula may be illustrated by the following example:*

*Example.* During September 1973, Firm X produces 8,170 barrels of a single grade of crude petroleum from a particular property. During September 1972, 6,420 barrels of crude petroleum were

As above stated, the parties differ only in their views of the extent and type of governmental activity which will satisfy the prescription for regulating the prices for all crude oil. The questions presented on appeal for resolution are: (1) does retention of the authority to regulate prices in the future fulfill the statutory mandate or does it create an exemption, which is invalid to the extent that the detailed procedure set out in § 4(g)(2) of the Act has not been followed; (2) if the Act requires more than the mere retention of the authority to regulate prices, does the "regulation," provided for new and released crude oil, satisfy such additional requirement; and (3) assuming that 10 C.F.R. §§ 212.74(a) and (b) provide a valid form of regulation, does reliance upon the market for the establishment of the price of new and released crude oil satisfy the "equitable" price standard contained in the Act.

The Government argues, and the district court so held, that new and released crude oil have not been exempted from price controls. This court, it is implied, therefore need not decide whether the policy, permitting prices to float to the market level, provides sufficient control to constitute the "regulation" of prices, because FEA has retained the authority to impose more direct controls in the future.

This argument would be valid if the Act merely authorized the regulation of prices when or if the FEA, in its discretion, saw fit to do so, because in such a case, the failure presently to exercise that authority would not preclude the future imposition of controls. If, however, the Act *requires* that prices be regulated, any failure so to act, no matter how temporary, exempts present prices from the controls to which they should otherwise be subject.

■ The Act, by the use of such terms as "shall" and "direct," imposes a mandatory, non-discretionary duty to specify, or prescribe a method for fixing prices. *See, e. g.* Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935); Richbourg Motor Co. v. United States, 281 U.S. 528, 534, 50 S.Ct. 385, 74 L.Ed. 1016 (1930); National Treasury Employees Union v. Nixon, 492 F.2d 587, 601 (D.C.Cir.1974). Section 2(b), for example, provides that "[t]he purpose of [the] Act is to grant to the President . . . and *direct him to exercise* specific temporary authority to deal with shortages of crude oil . . . [This] authority . . . *shall be exercised* for the purpose of minimizing the adverse impacts of [such] shortages." (Emphasis added.) Section 4(a), moreover, specifies that "the President *shall* promulgate a regulation providing for the mandatory allocation of crude oil . . . at prices specified in (or determined in a manner prescribed by) such regulation. . . ." And, § 4(a) further provides that ". . . such regulation *shall* apply to all crude oil. . ." (Emphasis added.)

■ Congress, moreover, by including the specific and comprehensive requirements of § 4(g)(2) has exhibited a clear policy of restricting and closely controlling the grant of exemptions.

■ This court, in the face of such legislative intent and the clear and unambiguous meaning of the Act, must reject any interpretation of the Act, such as that proffered by appellee, which would permit the Executive, acting through the FEA, to evade a non-discretionary duty and to enlarge the authori-

---

produced from the same property. The ceiling price for the September 1973 crude petroleum is $4.10 per barrel, and its free market price (i. e., the price X can get on the market for the 1,750 barrels of new crude) is $4.95 per barrel. The maximum price that X may charge for the 6,420 barrels of other than new crude petroleum (i. e., old plus released crude) produced in September 1973 is:

$$P \max = \$4.10 + (8{,}170/6{,}420 - 1)$$
$$(\$4.95 - \$4.10)$$
$$P \max = \$4.10 + (.27)(\$0.85)$$
$$P \max = \$4.10 + \$0.23$$
$$P \max = \$4.33/\text{barrel.}"$$

ty to create exemptions simply by describing as "subject to controls" that which may simply be determined by the forces of an uncontrolled market.

■ FEA stresses the fact that the regulations at issue do not in precise terms "exempt" the new and released oil from price controls. This literal approach, adopted by the district court, was rejected by the Supreme Court in Federal Power Commission v. Texaco, Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). The question is not whether all oil remains "subject to" price controls, but whether the controls mandated by the Act have in fact been imposed. Insofar as FEA has not regulated prices in compliance with the Act, it has created a *de facto* exemption which is invalid to the extent that the detailed procedures set out in § 4(g)(2) have not been followed.[6]

■ While the Act directs that the prices for all categories of crude oil be regulated, it does not specify a particular method for doing so. Consequently FEA has discretion in devising a regulatory scheme, but it cannot adopt measures which contravene a statutory mandate. *See, e. g.* Permian Basin Rate Cases, 390 U.S. 747, 776–777, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Wisconsin v. Federal Power Commission, 373 U.S. 294, 309, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942).

■■ We hold that the FEA did not abuse its discretion by promulgating 10 C.F.R. § 212.74(b). Nothing in the language of § 4(a) suggests that prices cannot be prescribed or determined in part with reference to or in relation to market prices. The Act only requires that prices be specified in, or determined in a manner ordained by, the implementing regulation. This requirement is satisfied by a plan calling for a ceiling on prices. *See, e. g.* Permian Basin Rate Cases, *supra*, 390 U.S. at 768–790, 88 S.Ct. 1344, 20 L.Ed.2d 312.

■ The regulation concerning new oil, 10 C.F.R. § 212.74(a), is another matter. The district court held that FEA, by permitting the price to be set exclusively by the operation of the free market, has complied with the Act. New crude oil, however, would sell at the market price even in the absence of such administrative regulation. FEA, therefore, has "permitted" new crude to sell at the market level only in the sense that it has taken no action to compel a different result. If Congress intended that the market could be used as the exclusive regulator of prices, then it could have *authorized* the President to impose a simple pricing mechanism. Congress, however, has *required* the promulgation of regulations for all crude oil. And, because Congress will not be presumed to have done a useless, ineffective, or absurd thing, *see, e. g.* Pennsylvania v. Nelson, 350 U.S. 497, 509–510, 76 S.Ct. 477, 100 L.Ed. 640 (1956), the presumption arises that § 4(a) cannot be satisfied by an administrative scheme which necessarily results in the same price which would prevail in its absence.

The district court concluded that the Act conferred a great deal of discretion upon the President to formulate a pricing mechanism. This derives in part from § 4(b) which requires that the President maximize "to the . . . extent practicable" the various goals set out in that section, many of which conflict with one another. One such goal is the "minimization of economic distortion, inflexibility, and unnecessary interference with

---

**6.** Although the court below did not address the issue of compliance with § 4(g)(2), we do not remand because the record unequivocally shows that an exemption, to the extent that one has been granted, is no longer valid. Appellee Sawhill promulgated the regulations at issue on January 15, 1974. Section 4(g)(2) provides that an exemption, even if validly granted, may remain in force for no more than 90 days, a period which has long since expired. To the extent that we hold that 10 C.F.R. § 212.74(a) fails to specify, or prescribe a manner for the determination of price, and that FEA has created a *de facto* exemption, this exemption, even if it is assumed that the other requirements of § 4(g)(2) had been satisfied, is no longer valid.

market mechanisms." § 4(b)(1)(I). The trial court relied upon this statement of objectives to support its holding.

Although the President is afforded wide discretion and must attempt to minimize market interference, it was error to conclude that the congressional intent and requirement for affirmative and express regulation of all crude oil could be neutralized in whole or in part and that 10 C.F.R. § 212.74(a) could, therefore, be regarded as a valid implementing regulation. This construction would render superfluous various other mandatory provisions of the Act.[7]

The Government, on this appeal, does not stand on the theory adopted by the district court. It concedes that the Act requires some form of active interference with the operation of the free market, but it takes the position that the Act has been satisfied because governmental action causes the *average* price level for all crude oil to vary from that which would prevail under free market conditions. New crude oil, according to the Government, normally constitutes only a portion of the total output of each oil-producing property so that the average of the prices charged by each producer for *all* his oil is lower than it would be in the absence of the regulations at issue and that therefore FEA has in effect regulated the price for all crude oil.

If this theory were to be adopted, then a simple regulation governing the total amount any one producer could receive for his oil, be it "old," "new," "released" or otherwise, would be adequate. But to be permissible, a scheme of indirect regulation must still meet the requirement that the Government affect the price for each category of crude oil and not just that of crude oil taken as a whole. While the provision that FEA specify or prescribe a method for the determination of price does not call for the imposition of price ceilings and can be satisfied by a scheme which affects prices indirectly, we are of the opinion that the ceilings imposed on old and released crude in the present case do not result in governmental regulation of the price of new oil. A requirement to regulate the price of all crude oil, directly or indirectly, is not satisfied by an administrative scheme which affects only the average price of crude oil and not the price of each component category. Although the Supreme Court upheld a regulation of the Federal Power Commission which indirectly controlled rates charged by natural gas producers, Federal Power Commission v. Texaco, Inc., *supra,* that case differed critically from the present case. It came about in this way. The Natural Gas Act, 15 U.S.C. § 717, required that the Government regulate the rates charged by all producers. The administrative regulation, however, failed directly to regulate small producers of natural gas, even though they came within the scope of the Act. The

---

7. For example, as a prerequisite to the grant of an exemption under § 4(g)(2), the President must explicitly find that ". . . application of the [implementing regulation] is not necessary to carry out [the purposes of the Act]." An exemption from 10 C.F.R. § 212.-74(a) could only be granted, therefore, if the free operation of the market is no longer necessary to "minimize . . . interference with market mechanisms," one of the purposes of the statute. As an alternative the district court would be forced to conclude that an exemption to 10 C.F.R. § 212.74(a) could never be granted.

Similarly, to exempt any crude oil, presently covered by the regulation, from the operation of 10 C.F.R. § 212.74(a) it would be necessary to set prices for such excluded category by some mechanism other than the exclusive operation of the free market. The President's authority, however, to interfere in the free market derives from the Act itself. The theory underlying the decision of the trial court would lead to the conclusion that an exemption could never be granted, because, if the regulation is not necessary to carry out the purposes of the Act, then the Act cannot be cited in support of the price tampering which an exemption would necessitate. Such a result, however, would render superfluous the detailed and comprehensive section of the Act which provides an explicit procedure for the grant of exemptions. It would also prevent the President from granting exemptions in an attempt to secure "to the maximum extent practicable" the achievement of the statutory goals in meeting changing developments in the petroleum field.

Supreme Court upheld the validity of the regulation because the entire output of these small, non-regulated producers was purchased only by the pipelines and large natural gas companies which would exert pressure to keep the freely floating rates in line with the "just and reasonable" rates to which the regulations compelled the larger producers to adhere. On the other hand, in the present case, the "average weighted price per barrel," is merely a mathematical construct with no moderating effect on the price of new crude oil, which is presently set exclusively by the operation of the "law" of supply and demand. We, therefore, hold that FEA has not specified or prescribed a manner for determining the price of new crude oil and that 10 C.F.R. § 212.74(a) operates to create an invalid exemption.

We also hold that 10 C.F.R. § 212.74(a) is invalid on the separate ground that the use of the market as the sole factor in determining price fails to satisfy the statutory precept that the price of all crude be set at an equitable level.

The Emergency Petroleum Allocation Act was enacted in part in an effort to " . . . *restore* and foster competition in the producing [sector] . . . of [the petroleum] industry." § 4(b)(1)(D). (Emphasis added.) Congress has also directed that the President,

" . . . in exercising [his] authority, strike an equitable balance between the sometimes conflicting needs of providing adequate inducement for the production of an adequate supply of product and of holding down spiraling consumer costs." Conference Report, 93–628, 93d Cong., 1st Sess. 26 (1973), U.S.Code Cong. & Admin.News 1973, p. 2703.

In subjecting producers to regulation because of anticompetitive conditions in the industry and because of spiraling consumer prices, it is highly unlikely that Congress assumed that "equitable" prices could be conclusively determined by reference to market price. See, Federal Power Commission v. Texaco, Inc., *supra,* 417 U.S. at 395dd, 94 S.Ct. 2315, 41 L.Ed.2d 141.

The Government seeks to rebut this conclusion by arguing that the prices established under the regulation at issue are "equitable" in light of the conflicting concerns of the Act with the moderation of consumer prices and the promotion of the development of new sources of supply. The Natural Gas Act's mandate of "just and reasonable" rates requires, however, as the Supreme Court's opinion in *Texaco* illustrates, precisely the same balancing of the same competing objectives. And the Court there held that a two-tier pricing system under which one tier was determined by the market price exclusively was unlawful because, while the statute may have conflicting goals, Congress did not authorize any exceptions to the requirement that all rates be "fair and reasonable." *Id.* at 394dd, 94 S.Ct. 2315, 41 L.Ed.2d 141.

It is not the function of this court to determine what the equitable price is, or should be. We merely hold that the President, through the FEA, by permitting the price of new crude oil to float at free market levels, has not struck any balance and, as a result, has failed to satisfy the requirement that prices be set at an equitable level.

The judgment of the district court is reversed.

TAMM, Chief Judge (concurring and dissenting):

While I agree with that portion of the majority opinion which upholds FEA's "released" oil regulation, 10 C.F.R. § 212.74(b), I would also uphold the "new" oil regulation, 10 C.F.R. § 212.-74(a).

### I

I begin with an analysis of the relevant portions of the Act, their legislative history and the regulations promulgated thereunder. In response to widespread shortages of petroleum and petroleum products, Congress enacted the Emergency Petroleum Allocation Act, with its

avowed purpose "to grant to the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system." 15 U.S.C. § 751(b) (Supp. III, 1973). Hence, section 4(a) of the Act, 15 U.S.C. § 753(a), requires the President to "promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts . . . and at prices specified in (or determined in a manner prescribed by) such regulation." While unequivocally directing pervasive regulation, the Conference Report opined that "the clear and firm understanding on the part of the Managers of both Houses [is] that the mandatory allocation program . . shall not be designed or implemented in a manner which would have the net effect of occasioning a substantial reduction in the total supply of crude oil; residual fuel oil or refined petroleum products. It is expected that the President in applying the mandatory controls . . . *will assiduously avoid that result.*" [1]

Regardless of their specific terms, Congress also directed that, "to the maximum extent practicable," the regulations so promulgated provide for the following objectives:

(A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

15 U.S.C. § 753(b)(1) (Supp. III, 1973). The qualifying language, "to the maximum extent practicable," was "intended to give the President administrative flexibility in marshalling short supplies and equitably assigning them to particular needs." [2] A cursory reading of the

---

1. Conference Report, H.R.Rep. No. 93–628, 93d Cong., 1st Sess. 14, U.S.Code Cong. & Admin.News 1973, p. 2691. (1973) (emphasis added) [hereinafter H.R.Rep. No. 93–628].

2. H.R.Rep. No. 93–628 at 12, U.S.Code Cong. & Admin.News 1973, p. 2689.

objectives clearly indicates frequently competing interests; thus, "to the maximum extent practicable" also foreshadowed the necessity for a "balancing" approach to achieve maximization of the legislative goals.[3]

Regarding price controls, the Conference Report emphasized

> that the pricing controls called for in this legislation may, in those circumstances where pricing controls established pursuant to other federal authority are consistent with the requirements and objectives of this Act, merely confirm those controls in the regulation to be promulgated under authority of section 4 of this Act. It is expressly contemplated, for example, that the price controls established by Phase IV under authority of the Economic Stabilization Act would continue in effect unless and until required to be modified by the price regulation required to carry out the purposes of this Act. As a matter of administrative convenience, the President may wish to continue to exercise federal pricing controls through the Cost of Living Council and may, pursuant to section 5(b), assign to that agency responsibility for administering the price controls called for in this Act.

H.R.Rep. No. 93–628 at 26, U.S.Code Cong. & Admin.News 1973, p. 2702. Furthermore, the Report stated that the Act's reference to equitable prices (15 U.S.C. § 753(b)(1)(F))

> is specifically intended to emphasize that one of the objectives of the mandatory allocation program is to prevent price gouging or price discrimination which might otherwise occur on the basis of current shortages. On the other hand, it is contemplated that prices for allocated fuels will be set at levels or pursuant to methods which will permit adequate compensation to

assure that private property is not implicitly confiscated by the government. Most importantly, the President must, in exercising this authority, strike an equitable balance between the sometimes conflicting needs of providing adequate inducement for the production of an adequate supply of product and of holding down spiraling consumer costs.

*Id.*, U.S.Code Cong. & Admin.News 1973, pp. 2702–2703.

Accoutered with this legislative ordnance the President established the Federal Energy Office (FEO) and delegated to it his authority under section 203(a)(3) of the Economic Stabilization Act of 1970,[4] the Emergency Petroleum Allocation Act, *supra*, and the Defense Production Act of 1950 [5] as it relates to production, conservation, use, control, distribution and allocation of energy. Exec. Order No. 11,748, 3 C.F.R. 376 (1974). Centralization of petroleum allocation and pricing was completed when the Cost of Living Council (CLC) delegated its crude oil and petroleum products price stabilization authority under the Economic Stabilization Act to FEO. CLC Order No. 47, 39 Fed.Reg. 24 (Jan. 2, 1974). Shortly thereafter, FEO issued its Petroleum Allocation and Price Regulations, 39 Fed.Reg. 1924–61 (1974), effective January 15, 1974, which constitute the gravamen of this case. *Pendente lite,* FEA, created by the Federal Energy Administration Act of 1974, Pub.L. No. 93–275 (May 7, 1974), assumed the functions of the now defunct FEO. *See* Exec. Order No. 11,790, 39 Fed.Reg. 23,185 (June 27, 1974).

The regulations at issue adopted, essentially unchanged, the so-called "two-tier" price system originally implemented by CLC as part of its Economic Stabilization Program.[6] As both parties agree, "old" oil—oil from properties producing at, or less than, their 1972 pro-

---

**3.** *See, e. g.*, H.R.Rep. No. 93–628 at 11–12.

**4.** 12 U.S.C. § 1904 (note) (1970), as amended, (Supp. III, 1973).

**5.** 50 U.S.C.App. § 2061 et seq. (1970), as amended, (Supp. III, 1973).

**6.** *Compare* 6 C.F.R. §§ 150.353, 150.354 (1974) *with* 10 C.F.R. §§ 212.73, 212.74, 39 Fed.Reg. 1952 (1974).

duction level—is subject to the "ceiling price rule",[7] and accounts for approximately 60 percent of domestic crude production.[8] Although accounting for approximately 13 percent of domestic crude production, stripper wells, those producing less than ten barrels per day, are specifically exempt from allocation and price controls. 15 U.S.C. § 753(e)(2). FEA's regulation of the remaining oil, "new" and "released", which account for 16 and 11 percent respectively of domestic crude production, [9] is at the heart of this dispute.

The price of both new and released crude oil is determined pursuant to the "special release rule". [10] Thus, new crude oil, equal to the amount of domestic crude produced and sold from a property in a specific month above the amount produced and sold from that property during a base month in 1972, may be sold without regard to the ceiling price, i. e., at the market price.[11] If a particular property did not produce at all in 1972, the base year, then all of its current production is new oil and accordingly, may be sold at the market price.

**7.** 10 C.F.R. § 212.73, 39 Fed.Reg. 1952 (1974), ceiling price rule reads:

(a) *Rule.* Except as provided in section 212.74, no producer may charge a price higher than the ceiling price for the first sale of domestic crude petroleum.

(b) *Ceiling price determination.* The ceiling price for a particular grade of domestic crude petroleum in a particular field is the sum of (1) the highest posted price at 6 a.m., local time, May 15, 1973, for that grade of crude petroleum at that field, or if there are no posted prices in that field, the related price for that grade of domestic crude petroleum which is most similar in kind and quality at the nearest field for which prices are posted; and (2) a maximum of $1.35 per barrel.

**8.** App. at 239.

**9.** *Id.*

**10.** 10 C.F.R. § 212.74, 39 Fed.Reg. 1952 (1974), special release rule reads:

(a) Notwithstanding the provisions of § 212.73(a), a producer of new crude petroleum produced and sold from a property may in the month produced, beginning with the month of September 1973, or in any subsequent month, sell that new crude petroleum without respect to the ceiling price. However, if the amount of crude petroleum produced and sold in any month subsequent to the first month in which new crude petroleum was produced and sold, is less than the base production control level for that property for that month, any new crude petroleum produced from that property during any subsequent month may not be sold pursuant to this paragraph until an amount of the new crude petroleum equal to the difference between the amount of crude petroleum actually produced from that produced from that property during the earlier month and the base production control level for that property for the earli-

er month has been sold at or below its ceiling price.

(b) Released crude. Notwithstanding paragraph (a) of this section, if during a particular month new crude petroleum which could be sold at other than the ceiling price pursuant to paragraph (a) of this section is produced from a property, the entire base production control level crude petroleum for that month may be sold at a price which exceeds the ceiling price: *Provided,* That the maximum price charged per barrel of that base production control level crude petroleum does not exceed the lesser of (1) the current free market price for the particular quality or grade of crude petroleum or (2) the price derived pursuant to the following:

Where:

$$P_{max} = P_c + \left[ \frac{C_{pr}}{C_{bpcl}} - 1 \right] (P_m - P_c)$$

P max = Maximum price that may be charged for the crude petroleum (other than new crude) purchased from the property (dollars per barrel);

$P_c$ = Ceiling price of the crude petroleum (dollars per barrel);

$C_{bpcl}$ = Base production control level for property (barrels);

$C_{pr}$ = Total amount of crude petroleum produced from the property during the month (barrels); and

$P_m$ = Current free market price of the particular quality and grade of crude petroleum (dollars per barrel).

Application of this formula may be illustrated by the following example:

*Example.* During September 1973, Firm X produces 8,170 barrels of a single grade of crude petroleum from a particular prop-

**11.** See note 11 on page 1124.

For released oil the special release rule presents a more complicated situation. Where a property is now producing in excess of its 1972 production level, that oil produced up to the 1972 level is released oil; of course, the excess is new oil.[12] The maximum allowable price for released oil is the lesser of the current market price or the price derived pursuant to a formula established by the special release rule.[13] The formula engenders a price for released oil that is a function of the base period production level, the May 15, 1973 posted price, the current market price, and the amount by which current production exceeds base period production.[14] The result is that when a producer's revenues from a sale of new and released oil from a particular property are averaged, the *weighted average price* may be well below the current market price.[15] Most importantly,

---

erty. During September 1972, 6,420 barrels of crude petroleum were produced from the same property. The ceiling price for the September 1973 crude petroleum is $4.10 per barrel, and its free market price (i. e., the price X can get on the market for the 1,750 barrels of new crude) is $4.95 per barrel. The maximum price that X may charge for the 6,420 barrels of other than new crude petroleum (i. e., old plus released crude) produced in September 1973 is:

$$P_{max} = \$4.10 + (8,170/6,420 - 1)(\$4.95 - \$4.10)$$
$$P_{max} = \$4.10 + (.27)(\$0.85)$$
$$P_{max} = \$4.10 + \$0.23$$
$$P_{max} = \$4.33/\text{barrel}.$$

(c) Certification. Each producer of domestic crude petroleum which charges a price above the ceiling price pursuant to the provisions of this section must, with respect to each sale of domestic crude petroleum, certify in writing to the purchaser: (1) the ceiling price of domestic crude petroleum, (2) the amount of the new crude petroleum and (3) the amount of the base production control level crude petroleum. The certification shall also contain a statement that the price charged for the domestic crude petroleum is no greater than permitted pursuant to this subpart.

"Base production control level", "property", and "new crude petroleum" are defined by 10 C.F.R. § 212.72, 39 Fed.Reg. 1952 (1974) as follows:

"Base production control level" for a particular month for a particular property means:

(1) if crude petroleum was produced and sold from that property in every month of 1972, the total number of barrels of domestic crude petroleum produced and sold from that property in the same month of 1972;

(2) if domestic crude petroleum was not produced and sold from that property in every month of 1972, the total number of barrels of domestic crude petroleum produced and sold from that property in 1972 divided by 12.

"Property" is the right which arises from a lease or from a fee interest to produce domestic crude petroleum.

"New crude petroleum" means the total number of barrels of domestic crude petroleum produced and sold from a property in a specific month less the base production control level for that property.

11. 10 C.F.R. § 212.74(a), 39 Fed.Reg. 1952, *supra*, note 10. Note especially the "however" clause of this section, providing for sale at or below ceiling price of certain crude in situations where the amount of crude oil produced and sold in any month subsequent to the first month in which new crude oil was produced and sold is less than the base production control level for that property for that month.

12. 10 C.F.R. § 212.74(b), 39 Fed.Reg. 1952, *supra*, note 10.

13. *Id.* There is disagreement between the parties as to whether the formula in fact permits released oil to be sold at market price. Compare App. 108–12 with App. 219–20. While there is *some* support for Consumers Union's analysis of the pricing effect of the regulation, deference must be accorded to FEA's expertise in interpreting its own regulation. Power Reactor Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Pacific Coast Meat Jobbers Ass'n, Inc. v. Cost of Living Council, 481 F.2d 1388, 1392 (Em.App.1973) and cases cited therein. This is especially sound judicial policy where, as here, Consumers Union does not contend that FEA enforces the regulation contrary to its interpretation. Absent such representations, I presume that FEA in fact enforces the regulation as it has represented to this court.

14. FEA's Br. at 11; App. at 109.

15. App. at 108–12. Even under Consumers Union's released oil formula calculations, App. at 219–20, the weighted average price per barrel of new, released and old oil is substantially less than the given market price.

The majority dismisses the average weighted price per barrel as "merely a mathematical construct with no moderating effect on the price of new oil . . . ." Maj. Op. at 1120.

FEA's analysis of the formula at work vividly illustrates its inherent production incentive.[16]

## II

Against this background, I now proceed to analyze the issues raised and argued by the parties. Both parties, the District Court Judge and the majority agree that the Emergency Petroleum Allocation Act imposes upon FEA a mandatory duty to "regulate" the price of new and released crude oil. I also agree, and hence, the ultimate question to be resolved is whether the challenged regulation adequately implements this Congressional mandate. Consumers Union's argument is twofold. First, it argues that FEA's use of "free market price" in its regulatory scheme for new and released oil violates the mandate of section 4(a) to specify or prescribe a manner for determining price of all crude oil and thus creates a prohibited non-statutory exemption to the Act. Consumers Union's Br. at 9–10. Second, Consumers Union maintains that FEA, by permitting new and released crude oil to be sold at the free market price, violates its mandatory duty to establish "equitable" prices for such oil. Consumers Union's Br. at 13–25. These contentions are addressed *seriatim*.

Section 4(a) of the Act provides that "the President shall promulgate a regulation providing for the mandatory allocation of crude oil, . . . at prices specified in (*or determined in a manner prescribed by*) such regulation" and that "[e]xcept as provided in subsection (e) [the stripper well exception] such regulation shall apply to *all* crude oil, . . . produced in or imported into the United States." (Emphasis added.) I read this language as obviously condoning a regulation which prescribes a manner for de-termining prices of all crude oil. Quite literally, FEA has done so. However, Consumers Union asserts, and the majority agrees, that FEA's regulation, which utilizes free market price, does not prescribe a manner for determining all crude oil prices *within the meaning of the Act* and thereby creates a prohibited non-statutory exemption to it. I cannot agree.

It is appropriate at this juncture to digress momentarily to elaborate on the breadth of FEA's regulatory discretion under the Act. A starting point is the proposition that "the width of administrative authority must be measured in part by the purposes for which it was conferred." Permian Basin Area Rate Cases, 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312 (1968). Nowhere could this oft-repeated rubric be more relevant than where Congress acts in a crisis situation. The Emergency Petroleum Allocation Act is Congress' response to precisely such a situation. The regulations mandated by section 4(a) are to provide for, to the maximum extent practicable, the *broad* objectives of section 4(b)(1), *supra* part I. One would be at great pains to characterize this legislation as pervasively filling every interstice, leaving only mandatory duties to the administrative body charged with its implementation. To the contrary, I think the Congressional intent was to hew a sphere of responsibility within which FEA could decide how to proceed against the crisis. The grant of such broad regulatory discretion is inconsistent with Consumers Union's and the majority's view of FEA's statutory responsibilities.

Aside from the breadth of FEA's regulatory authority, it is abundantly clear that Congress specifically contemplated

The majority reaches this conclusion even in view of FEA's unquestioned representation that "[n]ew crude oil . . . normally constitutes only a portion of the total output of each oil-producing property so that the average of the prices charged by each producer for *all* his oil is lower than it would be in the absence of the regulations at issue . . . .." Maj. Op. at 1119. Thus, FEA has quite prop-erly infused its regulations with the realities of the petroleum industry and, indeed, while the average weighted price per barrel is a mathematical construct, it nevertheless plainly reflects the *effect* of FEA's regulations on the price of *all* crude oil.

**16.** App. at 111. Consumers Union has not disputed *this* effect.

the use of free market prices in the regulatory scheme. The Conference Report *emphasized* that "[i]t is *expressly* contemplated, for example, that the price controls established by Phase IV under authority of the Economic Stabilization Act *would continue in effect unless and until required to be modified* by the price regulation required to carry out the purposes of this Act." [17] As mentioned in part I, the Phase IV price controls were originally promulgated by CLC and adopted, essentially unchanged, by FEO, FEA's predecessor. Those Phase IV controls utilized free market price to precisely the same extent as the regulation challenged here. I think the above-quoted language establishes, beyond peradverture, Congressional recognition and approval of FEA's utilization of the "two-tier" system. Consumers Union, contrariwise, asserts that this language, "far from simply authorizing a continuation of [CLC] regulations . . . explicitly recognized that certain [CLC price controls] would be *inconsistent with* the mandatory pricing controls required by the new Allocation Act." [18] This position is belied by the clear import of the clause "unless and until required to be modified by the price regulation," which manifestly refers to a determination made when and if the *implementing agency* discerns a necessity for such action. If Consumers Union's assertion were correct, Congress, at the least, would have mentioned such a major "inconsistency" as utilization of free market prices in the regulatory scheme.

Having found that Congress legislated broad regulatory discretion to implement the Act and specifically contemplated free market price as a permissible ingredient of the regulatory scheme, I must reject Consumers Union's argument and the majority's holding that FEA's utilization of free market price does not meet the legislative mandate to prescribe a manner for determining prices within the meaning of the Act. *A fortiori*, Consumers Union's argument that utilization of free market price creates a non-statutory exemption to the act must also fall because the price of *all* crude oil is in fact regulated *within the meaning of the Act.*

The majority opinion on this issue is particularly disturbing. The majority reasons that "[n]ew crude oil . . . would sell at the market price even in the absence of such administrative regulation [10 C.F.R. § 212.74(a)]" and thus, "because Congress will not be presumed to have done a useless, ineffective, or absurd thing, *see, e. g.,* Pennsylvania v. Nelson, 350 U.S. 497, 509–510, 76 S.Ct. 477, 100 L.Ed. 640 (1956), the presumption arises that § 4(a) cannot be satisfied by an administrative scheme which necessarily results in the same price which would prevail in its absence." Maj. Op. at 1118. Several aspects of this reasoning merit further analysis. First, the admittedly true fact that new crude oil would sell at the market price in the absence of regulation overlooks the even more basic fact that in the absence of regulation there simply would be no such thing as "new" oil, or, for that matter, "old" or "released" oil, all of which are administrative creations. The point is that these categories of oil, each with a price determined by different regulations, represents precisely the balancing of competing objectives contemplated by Congress. Second, the majority states that "Congress will not be presumed to have done a useless, ineffective, or absurd thing . . .." Aside from the implicit notion here that the new oil regulation is "useless, ineffective, or absurd," which I find without basis when viewed in context of the *entire* administrative scheme, this case is not one which calls for presumptions. The majority need not presume what Congress intended when the legislative history clearly resolves statutory ambiguities. *See supra,* part I. If presumptions are the order of the day, the majority should also

---

**17.** H.R.Rep. No. 93–628 at 26, U.S.Code Cong. & Admin.News 1973, p. 2702 (emphasis added). *See supra,* part I text.

**18.** Consumers Union's Reply Br. at 8–9. (Emphasis in original.)

note this court's recognition of "a strong presumption in favor of administrative decisions by those agencies charged with immediate administration of a new federal statute." Reeves v. Simon, 507 F.2d 455 at 460 (T.E.C.A. 1974).[19] Finally, the majority's presumption that "an administrative scheme which necessarily results in the same price which would prevail in its absence," which leads to its conclusion that utilization of market price here will not do, raises an interesting dilemma. When Consumers Union initiated this action it also challenged FEA's regulations regarding the price of exported and imported oil. 10 C.F.R. §§ 212.53(a) and 212.53(b). Those regulations, also upheld by the district court, utilize free market price to the same extent as FEA's new oil regulation. Although Consumers Union has not challenged the district court's ruling regarding the export-import oil regulations, Consumers Union's Br. at 5 n. 1, the clear import of the majority's opinion today is that those regulations too must fall. It will be interesting to observe exactly how FEA will either indirectly or through price ceilings regulate, with the "precept" of equitable prices in mind, imported oil from the international cartel of OPEC nations. However, perhaps the majority has provided for this contingency in its statement that "Congress will not be presumed to have done a useless, ineffective or absurd thing . . .."

I turn now to Consumers Union's second argument, that FEA, by permitting new and released crude oil to be sold at the free market price, violated its mandatory duty to establish "equitable" prices. In this regard, it appears that the majority has adopted Consumers Union's woeful misconstruction of the statutory language. Equitable prices are

mentioned in section 4(b)(1)(F) as *one* of nine separate objectives which Congress directed the regulation promulgated under section 4(a) should provide for *to the maximum extent practicable.* The Conference Report *specifically* states that the objectives "are collective *goals,* and the conferees have not attempted to discern an order of precedence or value one against another. It is fully recognized that, in some instances, it may be impossible to satisfy one objective without sacrificing the accomplishment of another." H.R.Rep. No. 93–628 at 11–12, U.S.Code Cong. & Admin.News 1973, p. 2688 (emphasis added). I am convinced that the objectives necessitate a balancing approach by FEA to effectuate maximum achievement of their competing interests. *See* Union Oil Co. v. FEA, Civil No. 74–1943–MML (C.D.Cal., July 25, 1974), FEA's Br. at App. C; Trans World Airlines, Inc. v. FEO, 380 F.Supp. 560 (D.D.C., 1974), FEA's Br. at App. D. Moreover, FEA's utilization of free market price for a maximum of 27 percent of all crude petroleum production (excluding stripper wells) is, to me, a statutorily permissible means of accomplishing the necessary balancing of objectives. The majority's elevation of one of the nine Congressional objectives to the level of a "precept" is absolutely without support in the Act or its legislative history.

Finally, Consumers Union places substantial weight on the Supreme Court's recent decision in FPC v. Texaco, 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). Having examined that case in detail, I must agree with FEA that Consumers Union's reliance thereon is misplaced. *Texaco* concerned a Commission order which, utilizing a "two-tier" rate-making system, exempted natural gas

**19.** *Citing* University of Southern California v. Cost of Living Council, 472 F.2d 1065, 1068–69 (Em.App.1972); Pacific Cost Meat Jobbers Ass'n v. Cost of Living Council, 481 F.2d 1388, 1391–92 (Em.App.1973); Mandel v. Simon, 493 F.2d 1239, 1240 (Em.App.1974). The division in *Reeves, quoting Mandel,* at 1240, stated: "The Federal Energy Office must have great flexibility during the formative period of regulation. Judicial interfer-

ence at this time may delay rather than advance effective regulation of this area." Moreover, the deference due agency interpretation of a statute it is charged with administering is by no means unique to this court. *See, e. g.,* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692 at 706 (D.C.Cir., 1974).

sales by small producers from direct rate regulation. However, the Commission asserted that those rates would in fact be regulated indirectly by its regulation of rates of pipelines and large producers, customers of the small producers. The Court held that, while the two-tier system was not *per se* unlawful, *id.* at 386–93, 94 S.Ct. 2315, the order in question was so ambiguous that the Court could not say that FPC proposed to rely on only "free market price", which the Court had condemned, or "other factors", which the Court, while not specifically condoning such factors, stated that the case would be "far different" had the Commission verbalized in its order its appellate counsel's *post hoc* rationalizations. *Id.* at 393–97, 94 S.Ct. 2315. Finally, the Court stressed its view that "the prevailing price in the market place cannot be the final measure of 'just and reasonable' rates mandated by the [Natural Gas] Act." *Id.* at 397, 94 S.Ct. at 2326.

Consumers Union has proceeded to draw "closely analogous" parallels between *Texaco* and the instant case. To the extent the majority adopts this analysis, I think it has overly simplified the situation in that it erroneously ignores fundamental differences between the purpose and operative terms of the Natural Gas Act, 15 U.S.C. § 717 et seq., and the Emergency Petroleum Allocation Act, *supra.*

To begin with, mere juxtaposition of the two acts elicits strikingly obvious differences in the "rate-making" authority conferred upon the respective implementing agencies. The Gas Act's rate-making sections encompass such items as rates and charges, cost of production or transportation, costs of property,

accounting systems, and rates of depreciation. 15 U.S.C. §§ 717c, 717d, 717e, 717g and 717h (1970), respectively. Contrast this ubiquitous and detailed rate-making authority with the "price regulation" mandated by the Allocation Act as previously discussed. The Gas Act, pervasively regulates *all* facets of natural gas company rates while the Allocation Act, requires price regulation "to prevent price gouging or price discrimination which might otherwise occur on the basis of current shortages." H.R.Rep. No. 93–628 at 26, U.S.Code Cong. & Admin.News 1973, p. 2702. In short, the upshot of the Gas Act is to create a permanently regulated industry; whereas, the upshot of the Allocation Act is to establish *temporary* regulation of *some* aspects of an industry, most particularly distribution.

One remaining aspect of the *Texaco* decision merits discussion. Consumers Union and the majority seem to read the equitable price objective of the Allocation Act as synonymous with the Gas Act's mandate that natural gas rates be "just and reasonable," 15 U.S.C. § 717c(a), concluding that *Texaco* would prohibit FEA's regulations' partial acquiescence in a free market price. I think that *Texaco* is simply inapposite on this point. As previously discussed, "equitable price" as used in the Allocation Act is merely *one* of many objectives that FEA is to provide for to the maximum extent practicable. "Just and reasonable" as used in the Gas Act is mandatory; rather than being one objective among many, it is *the* objective. The majority, to my mind, does not give proper weight to these fundamental distinctions.

On the basis of the aforementioned reasons, I would affirm the ruling of the district court in its entirety.