**CONSUMERS UNION OF the UNITED STATES, INC., Plaintiff-Appellant,**

v.

**John C. SAWHILL, Administrator of the Federal Energy Administration, Defendant-Appellee,**

**Independent Petroleum Association of America, etc., et al., Amicus Curiae,**

**and**

**State of Louisiana, Amicus Curiae.**

**No. DC–26.**

Temporary Emergency Court of Appeals.

July 7, 1975.

Peter H. Schuck, Washington, D. C., for plaintiff-appellant.

C. Max Vassanelli, Atty., Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., Irving Jaffe, Acting Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, were on the brief, for defendant-appellee.

James R. Patton, Jr. and David B. Robinson of Patton, Boggs & Blow, Washington, D. C., Harry E. Barsh, Jr. of Camp, Carmouche, Palmer, Carwile & Barsh, Lake Charles, La., on the brief for amicus curiae State of Louisiana.

William Simon, William R. O'Brien, Harold D. Rhynedance, Jr. of Howrey, Simon, Baker & Murchinson, Washington, D. C., on the brief, for amicus curiae Independent Petroleum Assn. of America and others.

Before TAMM, Chief Judge, and CARTER, HASTIE, ANDERSON, CHRISTENSEN, JOHNSON and HASTINGS, Judges.

TAMM, Chief Judge:

This case was previously before a division of the court, which held, with one member dissenting, that the Federal Energy Administration's (FEA) "new oil" regulation, allowing that oil to be sold without regard to the ceiling price, was invalid under the Emergency Petroleum Allocation Act (the Act). The division also held that FEA's "released oil" regulation, allowing that oil to be sold at a price determined by a formula, was valid under the Act because "[n]othing in the language of § 4(a) suggests that prices cannot be prescribed or determined in part with reference to or in relation to market price." *Consumers Union of United States, Inc. v. Sawhill*, 512 F.2d 1112, at 1118 (Em.App.1975). We granted rehearing *en banc* because of the exceptional importance of the case in relation to FEA's regulatory scheme and, having thoroughly considered the arguments proffered by the parties, are constrained to vacate the judgment of the division majority for the reasons set forth in the concurring and dissenting opinion, attached hereto as an appendix, which we adopt together with the modification herein.

■ Although the background and regulatory framework are adequately described in the attached appendix, there remains one point that was only recently brought to the attention of the court, which requires further explication. Effective August 29, 1974, FEA amended its released oil regulation to provide that released oil, like new oil, be sold without regard to the ceiling price. 39 Fed.Reg. 31622–24 (Aug. 30, 1974). Since the released oil formula as discussed in the opinions of the division is no longer applicable, the amended released oil regulation must stand or fall with the new oil regulation. Our reasoning upholding it is twofold. First, both parties agree that the amended released oil regulation does not effectuate a change in the substance of its predecessor. *See id.* at 31622–23; Appellant's Supp.Mem. on Rehearing at 3–4. Thus, by amending the released oil regulation, FEA has only clarified an aspect of the two-tier system "expressly contemplated" by Congress when it passed the Act. App. at 4, 9–10. Second, the most recent statistics indicate that new and released oil account for approximately 22 percent of domestic crude production. Thus, as stated in the division dissenting opinion, "FEA's utilization of free market price for a maximum of [22] percent of all crude production (excluding stripper wells) is . . . a statutorily permissible means of accomplishing the necessary balancing of objectives." App. at 14. Of course, this is not to say that FEA may, consistent with its statutory responsibilities, unilaterally implement changes in its regulatory scheme not contemplated by Congress and not reflective of a balancing approach.

Unfortunately, Judge Anderson, with all due respect, apparently misperceives several fundamental aspects of our opinion. After thorough study of the opinion, he arrives at the conclusion that we "construe 'the grant of such broad regulatory discretion' to empower the FEA to free *any* category of crude oil from all regulation without complying with the required exemption procedure." Judge Anderson's Dissent at 1083–1084. To allay any subsequent misunderstanding, we categorically state that this characterization of our holding today is simply incorrect; our decision concerns new and released oil—old oil is unquestionably quite another matter. The dissent further suggests that we somehow heavily rely upon the goal of section 4(b)(1)(I) as "a justification for finding such a grant of the unlimited power as the majority would accord to FEA." *Id.* at 1084. This too is incorrect—we recognize that section 4(b)(1)(I) is but one of nine equally important *goals* and, certainly would not even attempt our dissenting colleague's leap of faith to elevate any one of those goals to the level of a mandatory duty as the dissent does with the goal of equitable prices. *Id.* at 1082 ("mandatory duty to establish equitable prices"), 1088 ("statutory *prescription*" and "equitable price *requirement*"). Notably, the dissent again makes no mention of the import-export oil problem. App. at 1085–1086. Finally, we are pleased that the dissent recognizes that (1) *FPC v. Texaco* "differed critically from the present case," Dissent at 1086 and (2) the present regulatory scheme provides "a strong incentive to drill wells which were not active during the base period," *id.* at 1087, thus illustrating FEA's effective balancing approach to the overall problem.

The judgment of the division is vacated and the district court is affirmed for the reasons stated in the division concurring and dissenting opinion and herein.

So ordered.

## APPENDIX

TAMM, *Chief Judge (concurring and dissenting)* :

While I agree with that portion of the majority opinion which upholds FEA's "released" oil regulation, 10 C.F.R. § 212.74(b), I would also uphold the "new" oil regulation, 10 C.F.R. § 212.-74(a).

### I

I begin with an analysis of the relevant portions of the Act, their legislative history and the regulations promulgated thereunder. In response to widespread shortages of petroleum and petroleum products, Congress enacted the Emergency Petroleum Allocation Act, with its avowed purpose "to grant to the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system." 15 U.S.C. § 751(b) (Supp. III, 1973). Hence, section 4(a) of the Act, 15 U.S.C. § 753(a), requires the President to "promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts . . . and at prices specified in (or determined in a manner prescribed by) such regulation." While unequivocally directing pervasive regulation, the Conference Report opined that "the clear and firm understanding on the part of the Managers of both Houses [is] that the mandatory allocation program . . . shall not be designed or implemented in a manner which would have the net effect of occasioning a substantial reduction in the total supply of crude oil, residual fuel oil or refined petroleum products. It is expected that the President in applying the mandatory controls . . . *will assiduously avoid that result.*" [1]

---

1. Conference Report, H.R.Rep.No.93–628, 93d Cong., 1st Sess. 14, U.S.Code Cong. & Admin. News 1973, p. 2691 (1973) (emphasis added) [hereinafter H.R.Rep.No.93–628].

■ Regardless of their specific terms, Congress also directed that, "to the maximum extent practicable," the regulations so promulgated provide for the following objectives:

(A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent markets, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

15 U.S.C. § 753(b)(1) (Supp. III, 1973). The qualifying language, "to the maximum extent practicable," was "intended to give the President administrative flexibility in marshalling short supplies and equitably assigning them to particular needs."[2] A cursory reading of the objectives clearly indicates frequently competing interests; thus, "to the maximum extent practicable" also foreshadowed the necessity for a "balancing" approach to achieve maximization of the legislative goals.[3]

Regarding price controls, the Conference Report emphasized

that the pricing controls called for in this legislation may, in those circumstances where pricing controls established pursuant to other federal authority are consistent with the requirements and objectives of this Act, merely confirm those controls in the regulation to be promulgated under authority of section 4 of this Act. It is expressly contemplated, for example, that the price controls established by Phase IV under authority of the Economic Stabilization Act would continue in effect unless and until required to be modified by the price regulation required to carry out the purposes of this Act. As a matter of administrative convenience, the President may wish to continue to exercise federal pricing controls through the Cost of Living Council and may, pursuant to section 5(b), assign to that agency responsibility for administering

2. H.R.Rep.No.93–628 at 12, U.S.Code Cong. & Admin.News 1973, p. 2689.

3. *See, e. g.,* H.R.Rep.No.93–628 at 11–12.

the price controls called for in this Act.

H.R.Rep.No.93–628 at 26, U.S.Code Cong. & Admin.News 1973, p. 2702. Furthermore, the Report stated that the Act's reference to equitable prices (15 U.S.C. § 753(b)(1)(F) )

> is specifically intended to emphasize that one of the objectives of the mandatory allocation program is to prevent price gouging or price discrimination which might otherwise occur on the basis of current shortages. On the other hand, it is contemplated that prices for allocated fuels will be set at levels or pursuant to methods which will permit adequate compensation to assure that private property is not implicitly confiscated by the government. Most importantly, the President must, in exercising this authority, strike an equitable balance between the sometimes conflicting needs of providing adequate inducement for the production of an adequate supply of product and of holding down spiraling consumer costs.

*Id.*

Accoutered with this legislative ordnance the President established the Federal Energy Office (FEO) and delegated to it his authority under section 203(a)(3) of the Economic Stabilization Act of 1970,[4] the Emergency Petroleum Allocation Act, *supra*, and the Defense Production Act of 1950[5] as it relates to production, conservation, use, control, distribution and allocation of energy. Exec.Order No. 11, 748, 3 C.F.R. 376 (1974).

Centralization of petroleum allocation and pricing was completed when the Cost of Living Council (CLC) delegated its crude oil and petroleum products price stabilization authority under the Economic Stabilization Act to FEO. CLC Order No. 47, 39 Fed.Reg. 24 (Jan. 2, 1974). Shortly thereafter, FEO issued its Petroleum Allocation and Price Regulations, 39 Fed.Reg. 1924–61 (1974), effective January 15, 1974, which constitute the gravamen of this case. *Pendente lite*, FEA, created by the Federal Energy Administration Act of 1974, Pub.L. No.93–275 (May 7, 1974), assumed the functions of the now defunct FEO. *See* Exec.Order No. 11, 790, 39 Fed.Reg. 23185 (June 27, 1974).

The regulations at issue adopted, essentially unchanged, the so-called "two-tier" price system originally implemented by CLC as part of its Economic Stabilization Program.[6] As both parties agree, "old" oil—oil from properties producing at, or less than, their 1972 production level—is subject to the "ceiling price rule,"[7] and accounts for approximately 60 percent of domestic crude production.[8] Although accounting for approximately 13 percent of domestic crude production, stripper wells, those producing less than ten barrels per day, are specifically exempt from allocation and price controls. 15 U.S.C. § 753(e)(2). FEA's regulation of the remaining oil, "new" and "released," which account for 16 and 11 percent respectively of domestic crude production,[9] is at the heart of this dispute.

---

**4.** 12 U.S.C. § 1904 (note) (1970), *as amended*, (Supp. III, 1973).

**5.** 50 U.S.C.App. § 2601 *et seq.* (1970), *as amended*, (Supp. III, 1973).

**6.** *Compare* 6 C.F.R. §§ 150.353, 150.354 (1974) *with* 10 C.F.R. §§ 212.73, 212.74, 39 Fed.Reg. 1952 (1974).

**7.** 10 C.F.R. § 212.73, 39 Fed.Reg. 1952 (1974), ceiling price rule reads:

> (a) *Rule.* Except as provided in section 212.74, no producer may charge a price higher than the ceiling price for the first sale of domestic crude petroleum.

> (b) *Ceiling price determination.* The ceiling price for a particular grade of domestic crude petroleum in a particular field is the sum of (1) the highest posted price at 6 a. m., local time, May 15, 1973, for that grade of crude petroleum at that field, or if there are no posted prices in that field, the related price for that grade of domestic crude petroleum which is most similar in kind and quality at the nearest field for which prices are posted; and (2) a maximum of $1.35 per barrel.

**8.** App. at 239.

**9.** *Id.*

The price of both new and released crude oil is determined pursuant to the "special release rule." [10] Thus, new crude oil, equal to the amount of domestic crude produced and sold from a property in a specific month above the amount produced and sold from that property during a base month in 1972, may be

10. 10 C.F.R. § 212.74, 39 Fed.Reg. 1952 (1974), special release rule reads:

(a) Notwithstanding the provisions of § 212.73(a), a producer of new crude petroleum produced and sold from a property may in the month produced, beginning with the month of September 1973, or in any subsequent month, sell that new crude petroleum without respect to the ceiling price. However, if the amount of crude petroleum produced and sold in any month subsequent to the first month in which new crude petroleum was produced and sold, is less than the base production control level for that property for that month, any new crude petroleum produced from that property during any subsequent month may not be sold pursuant to this paragraph until an amount of the new crude petroleum equal to the difference between the amount of crude petroleum actually produced from that produced from that property during the earlier month and the base production control level for that property for the earlier month has been sold at or below its ceiling price.

(b) Released crude. Notwithstanding paragraph (a) of this section, if during a particular month new crude petroleum which could be sold at other than the ceiling price pursuant to paragraph (a) of this section is produced from a property, the entire base production control level crude petroleum for that month may be sold at a price which exceeds the ceiling price: *Provided,* That the maximum price charged per barrel of that base production control level crude petroleum does not exceed the lesser of (1) the current free market price for the particular quality or grade of crude petroleum or (2) the price derived pursuant to the following:

$$P_{max} = P_c + \left[ \frac{C_{pr}}{C_{bpcl}} - 1 \right] (P_m - P_c)$$

$P_{max}$ = Maximum price that may be charged for the crude petroleum (other than new crude) purchased from the property (dollars per barrel);

$P_c$ = Ceiling price of the crude petroleum (dollars per barrel);

$C_{bpcl}$ = Base production control level for property (barrels);

$C_{pr}$ = Total amount of crude petroleum produced from the property during the month (barrels); and

$P_m$ = Current free market price of the particular quality and grade of crude petroleum (dollars per barrel).

Application of this formula may be illustrated by the following example:

*Example.* During September 1973, Firm X produces 8,170 barrels of a single grade of crude petroleum from a particular property. During September 1972, 6,420 barrels of crude petroleum were produced from the same property. The ceiling price for the September 1973 crude petroleum is $4.10 per barrel, and its free market price (i. e., the price X can get on the market for the 1,750 barrels of new crude) is $4.95 per barrel. The maximum price that X may charge for the 6,420 barrels of other than new crude petroleum (i. e., old plus released crude) produced in September 1973 is:

$$P_{max} = \$4.10 + (8,170/6,420 - 1) \ (\$4.95 - \$4.10)$$

$$P_{max} = \$4.10 + (.27) \ (\$0.85)$$

$$P_{max} = \$4.10 + \$0.23$$

$$P_{max} = \$4.33/\text{barrel}.$$

sold without regard to the ceiling price, *i. e.*, at the market price.[11] If a particular property did not produce at all in 1972, the base year, then all of its current production is new oil and accordingly, may be sold at the market price.

█ For released oil the special release rule presents a more complicated situation. Where a property is now producing in excess of its 1972 production level, that oil produced up to the 1972 level is released oil; of course, the excess is new oil.[12] The maximum allowable

price for released oil is the lesser of the current market price or the price derived pursuant to a formula established by the special release rule.[13] The formula engenders a price for released oil that is a function of the base period production level, the May 15, 1973 posted price, the current market price, and the amount by which current production exceeds base period production.[14] The result is that when a producer's revenues from a sale of new and released oil from a particular property are averaged, the *weighted average price* may be well below the current market price.[15] Most importantly,

(c) Certification. Each producer of domestic crude petroleum which charges a price above the ceiling price pursuant to the provisions of this section must, with respect to each sale of domestic crude petroleum, certify in writing to the purchaser: (1) the ceiling price of domestic crude petroleum, (2) the amount of the new crude petroleum and (3) the amount of the base production control level crude petroleum. The certification shall also contain a statement that the price charged for the domestic crude petroleum is no greater than permitted pursuant to this subpart.

"Base production control level," "property," and "new crude petroleum" are defined by 10 C.F.R. § 212.72, 39 Fed.Reg. 1952 (1974) as follows:

"Base production control level" for a particular month for a particular property means:

(1) if crude petroleum was produced and sold from that property in every month of 1972, the total number of barrels of domestic crude petroleum produced and sold from that property in the same month of 1972;

(2) if domestic crude petroleum was not produced and sold from that property in every month of 1972, the total number of barrels of domestic crude petroleum produced and sold from that property in 1972 divided by 12.

"Property" is the right which arises from a lease or from a fee interest to produce domestic crude petroleum.

"New crude petroleum" means the total number of barrels of domestic crude petroleum produced and sold from a property in a specific month less the base production control level for that property.

---

**11.** 10 C.F.R. § 212.74(a), 39 Fed.Reg. 1952, *supra*, note 10. Note especially the "however" clause of this section, providing for sale at or below ceiling price of certain crude in situations where the amount of crude oil produced and sold in any month subsequent to the first month in which new crude oil was produced and sold is less than the base production control level for that property for that month.

**12.** 10 C.F.R. § 212.74(b), 39 Fed.Reg. 1952, *supra*, note 10.

**13.** *Id.* There is disagreement between the parties as to whether the formula in fact permits released oil to be sold at market price. *Compare* App. 108–12 *with* App. 219–20. While there is *some* support for Consumers Union's analysis of the pricing effect of the regulation, deference must be accorded to FEA's expertise

in interpreting its own regulation. *Power Reactor Co. v. Electricians*, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 920 (1961); *Pacific Coast Meat Jobbers Ass'n, Inc. v. Cost of Living Council*, 481 F.2d 1388, 1392 (Em.App.1973) and cases cited therein. This is especially sound judicial policy where, as here, Consumers Union does not contend that FEA enforces the regulation contrary to its interpretation. Absent such representations, I presume that FEA in fact enforces the regulation as it has represented to this court.

**14.** FEA's Br. at 11; App. at 109.

**15.** App. at 108–12. Even under Consumers Union's released oil formula calculations, App. at 219–20, the weighted average price per barrel of new, released and old oil is substantially less than the given market price.

FEA's analysis of the formula at work vividly illustrates its inherent production incentive.[16]

## II

■ Against this background, I now proceed to analyze the issues raised and argued by the parties. Both parties, the District Court Judge and the majority agree that the Emergency Petroleum Allocation Act imposes upon FEA a mandatory duty to "regulate" the price of new and released crude oil. I also agree, and hence, the ultimate question to be resolved is whether the challenged regulation adequately implements this Congressional mandate. Consumers Union's argument is twofold. First, it argues that FEA's use of "free market price" in its regulatory scheme for new and released oil violates the mandate of section 4(a) to specify or prescribe a manner for determining price of all crude oil and thus creates a prohibited non-statutory exemption to the Act. Consumers Union's Br. at 9–10. Second, Consumers Union maintains that FEA, by permitting new and released crude oil to be sold at the free market price, violates its mandatory duty to establish "equitable" prices for such oil. Consumers Union's Br. at 13–25. These contentions are addressed *seriatim.*

■ Section 4(a) of the Act provides that "the President shall promulgate a regulation providing for the mandatory allocation of crude oil, . . . at prices specified in (*or determined in a manner prescribed by*) such regulation" and that "[e]xcept as provided in subsection (e) [the stripper well exception] such regulation shall apply to *all* crude oil,

. . . produced in or imported into the United States." (Emphasis added.) I read this language as obviously condoning a regulation which prescribes a manner for determining prices of all crude oil. Quite literally, FEA has done so. However, Consumers Union asserts, and the majority agrees, that FEA's regulation, which utilizes free market price, does not prescribe a manner for determining all crude oil prices *within the meaning of the Act* and thereby creates a prohibited non-statutory exemption to it. I cannot agree.

■ It is appropriate at this juncture to digress momentarily to elaborate on the breadth of FEA's regulatory discretion under the Act. A starting point is the proposition that "the width of administrative authority must be measured in part by the purposes for which it was conferred." *Permian Basin Area Rate Cases*, 390 U.S. 747, 776, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Nowhere could this oft-repeated rubric be more relevant than where Congress acts in a crisis situation. The Emergency Petroleum Allocation Act is Congress' response to precisely such a situation. The regulations mandated by section 4(a) are to provide for, to the maximum extent practicable, the *broad* objectives of section 4(b)(1), *supra* part I. One would be at great pains to characterize this legislation as pervasively filling every interstice, leaving only mandatory duties to the administrative body charged with its implementation. To the contrary, I think the Congressional intent was to hew a sphere of responsibility within which FEA could decide how to proceed against the crisis. The grant of such broad regulatory discretion is inconsist-

---

The majority dismisses the average weighted price per barrel as "merely a mathematical construct with no moderating effect on the price of new crude oil . . . ." 512 F.2d at 1120. The majority reaches this conclusion even in view of FEA's unquestioned representation that "[n]ew crude oil . . . normally constitutes only a portion of the total output of each oil-producing property so that the average of the prices charged by each producer for *all* his oil is lower than it would be in the

absence of the regulations at issue . . . ." At 1119. Thus, FEA has quite properly infused its regulations with the realities of the petroleum industry and, indeed, while the average weighted price per barrel is a mathematical construct, it nevertheless plainly reflects the *effect* of FEA's regulations on the price of *all* crude oil.

16. App. at 111. Consumers Union has not disputed *this* effect.

ent with Consumers Union's and the majority's view of FEA's statutory responsibilities.

Aside from the breadth of FEA's regulatory authority, it is abundantly clear that Congress specifically contemplated the use of free market prices in the regulatory scheme. The Conference Report *emphasized* that "[i]t is *expressly* contemplated, for example, that the price controls established by Phase IV under authority of the Economic Stabilization Act *would continue in effect unless and until required to be modified* by the price regulation required to carry out the purposes of this Act." [17] As mentioned in part I, the Phase IV price controls were originally promulgated by CLC and adopted, essentially unchanged, by FEO, FEA's predecessor. Those Phase IV controls utilized free market price to precisely the same extent as the regulation challenged here. I think the above-quoted language establishes, beyond peradventure, Congressional recognition and approval of FEA's utilization of the "two-tier" system. Consumers Union, contrariwise, asserts that this language, "far from simply authorizing a continuation of [CLC] regulations . . . explicitly recognized that certain [CLC price controls] would be *inconsistent with* the mandatory pricing controls required by the new Allocation Act." [18] This position is belied by the clear import of the clause "unless and until required to be modified by the price regulation," which manifestly refers to a determination made when and if the *implementing agency* discerns a necessity for such action. If Consumers Union's assertion were correct, Congress, at the least, would have mentioned such a major "inconsistency" as utilization of free market prices in the regulatory scheme.

Having found that Congress legislated broad regulatory discretion to implement the Act and specifically contem-

plated free market price a permissible ingredient of the regulatory scheme, I must reject Consumers Union's argument and the majority's holding that FEA's utilization of free market price does not meet the legislative mandate to prescribe a manner for determining prices within the meaning of the Act. *A fortiori*, Consumers Union's argument that utilization of free market price creates a non-statutory exemption to the Act must also fall because the price of *all* crude oil is in fact regulated *within the meaning of the Act.*

The majority opinion on this issue is particularly disturbing. The majority reasons that "[n]ew crude oil . . . would sell at the market price even in the absence of such administrative regulation [10 C.F.R. § 212.74(a)]" and thus, "because Congress will not be presumed to have done a useless, ineffective, or absurd thing, *see e. g., Pennsylvania v. Nelson,* 350 U.S. 497, 509–510, 76 S.Ct. 477, 100 L.Ed. 640 (1956), the presumption arises that § 4(a) cannot be satisfied by an administrative scheme which necessarily results in the same price which would prevail in its absence." 512 F.2d at 1118. Several aspects of this reasoning merit further analysis. First, the admittedly true fact that new crude oil would sell at the market price in the absence of regulation overlooks the even more basic fact that in the absence of regulation there simply would be no such thing as "new" oil, or, for that matter, "old" or "released" oil, all of which are administrative creations. The point is that these categories of oil, each with a price determined by different regulations, represents precisely the balancing of competing objectives contemplated by Congress. Second, the majority states that "Congress will not be presumed to have done a useless, ineffective, or absurd thing . . . ." Aside from the implicit notion here that the new oil regulation is "useless, ineffective, or absurd," which I find without basis when viewed in context of the en-

---

**17.** H.R.Rep.No.93–628 at 26, U.S.Code Cong. & Admin.News 1973, p. 2702 (emphasis added). *See supra,* part I text.

**18.** Consumers Union's Reply Br. at 8–9 (emphasis in original).

*tire* administrative scheme, this case is not one which calls for presumptions. The majority need not presume what Congress intended when the legislative history clearly resolves statutory ambiguities. *See supra*, part I. If presumptions are the order of the day, the majority should also note this court's recognition of "a strong presumption in favor of administrative decisions by those agencies charged with immediate administration of a new federal statute." *Reeves v. Simon*, 507 F.2d 455 (Em.App. 1974).[19] Finally, the majority's presumption that "an administrative scheme which necessarily results in the same price which would prevail in its absence," which leads to its conclusion that utilization of market price here will not do, raises an interesting dilemma. When Consumers Union initiated this action it also challenged FEA's regulations regarding the price of exported and imported oil. 10 C.F.R. §§ 212.53(a) and 212.53(b). Those regulations, also upheld by the district court, utilize free market price to the same extent as FEA's new oil regulation. Although Consumers Union has not challenged the district court's ruling regarding the export-import oil regulations, Consumers Union's Br. at 5 n. 1, the clear import of the majority's opinion today is that those regulations too must fall. It will be interesting to observe exactly how FEA will either indirectly or through price ceilings regulate, with the "precept" of equitable prices in mind, imported oil from the international cartel of OPEC nations. However, perhaps the majority has provided for this contingency in its statement that "Congress will not be presumed to have done a useless, ineffective or absurd thing . . . ."

I turn now to Consumers Union's second argument, that FEA, by permitting new and released crude oil to be sold at the free market price, violated its mandatory duty to establish "equitable" prices. In this regard, it appears that the majority has adopted Consumers Union's woeful misconstruction of the statutory language. Equitable prices are mentioned in section 4(b)(1)(F) as *one* of nine separate objectives which Congress directed the regulation promulgated under section 4(a) should provide for *to the maximum extent practicable.* The Conference Report *specifically* states that the objectives "are collective *goals,* and the conferees have not attempted to discern an order of precedence or value one against another. It is fully recognized that, in some instances, it may be impossible to satisfy one objective without sacrificing the accomplishment of another." H.R.Rep.No.93–628 at 11–12, U.S.Code Cong. & Admin.News 1973, p. 2688 (emphasis added). I am convinced that the objectives necessitate a balancing approach by FEA to effectuate maximum achievement of their competing interests. *See Union Oil Co. v. FEA,* Civil No. 74–1943–MML (C.D.Cal., July 25, 1974), FEA's Br. at App. C; *Trans World Airlines, Inc. v. FEO,* 380 F.Supp. 560 (D.D.C.1974), FEA's Br. at App. D. Moreover, FEA's utilization of free market price for a maximum of 27 percent of all crude petroleum production (excluding stripper wells) is, to me, a statutorily permissible means of accomplishing the necessary balancing of objectives. The majority's elevation of one of the nine Congressional objectives to the level of a "precept" is absolutely without support in the Act or its legislative history.

Finally, Consumers Union places substantial weight on the Supreme

19. Citing *University of Southern California v. Cost of Living Council,* 472 F.2d 1065, 1068–69 (Em.App.1972); *Pacific Coast Meat Jobbers Ass'n v. Cost of Living Council,* 481 F.2d 1388, 1391–92 (Em.App.1973); *Mandel v. Simon,* 493 F.2d 1239, 1240 (Em.App.1974). The division in *Reeves, quoting Mandel,* at 1240, stated: "The Federal Energy Office must have great flexibility during the formative period of regu- lation. Judicial interference at this time may delay rather than advance effective regulation of this area." Moreover, the deference due agency interpretation of a statute it is charged with administering is by no means unique to this court. *See, e. g., Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692 (D.C.Cir.1974).

Court's recent decision in *FPC v. Texaco,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). Having examined that case in detail, I must agree with FEA that Consumers Union's reliance thereon is misplaced. *Texaco* concerned a Commission order which, utilizing a "two-tier" ratemaking system, exempted natural gas sales by small producers from direct rate regulation. However, the Commission asserted that those rates would in fact be regulated indirectly by its regulation of rates of pipelines and large producers, customers of the small producers. The Court held that, while the two-tier system was not *per se* unlawful, *id.* at 386–93, 94 S.Ct. 2315, the order in question was so ambiguous that the Court could not say that FPC proposed to rely on only "free market price," which the Court had condemned, or "other factors," which the Court, while not specifically condoning such factors, stated that the case would be "far different" had the Commission verbalized in its order its appellate counsel's *post hoc* rationalizations. *Id.* at 393–97, 94 S.Ct. 2315. Finally, the Court stressed its view that "the prevailing price in the market place cannot be the final measure of 'just and reasonable' rates mandated by the [Natural Gas] Act." *Id.* at 397, 94 S.Ct. at 2326.

Consumers Union has proceeded to draw "closely analogous" parallels between *Texaco* and the instant case. To the extent the majority adopts this analysis, I think it has overly simplified the situation in that it erroneously ignores fundamental differences between the purpose and operative terms of the Natural Gas Act, 15 U.S.C. § 717 *et seq.,* and the Emergency Petroleum Allocation Act, *supra.*

To begin with, mere juxtaposition of the two acts elicits strikingly obvious differences in the "rate-making" authority conferred upon the respective implementing agencies. The Gas Act's rate-making sections encompass such items as rates and charges, cost of production or transportation, costs of property, ac-

counting systems, and rates of depreciation. 15 U.S.C. §§ 717c, 717d, 717e, 717g and 717h (1970), respectively. Contrast this ubiquitous and detailed rate-making authority with the "price regulation" mandated by the Allocation Act as previously discussed. The Gas Act, pervasively regulates *all* facets of natural gas company rates while the Allocation Act requires price regulation "to prevent price gouging or price discrimination which might otherwise occur on the basis of the current shortages." H.R.Rep.No. 93–628 at 26, U.S.Code Cong. & Admin. News 1973, p. 2702. In short, the upshot of the Gas Act is to create a permanently regulated industry; whereas, the upshot of the Allocation Act is to establish *temporary* regulation of *some* aspects of an industry, most particularly distribution.

One remaining aspect of the *Texaco* decision merits discussion. Consumers Union and the majority seem to read the equitable price objective of the Allocation Act as synonymous with the Gas Act's mandate that natural gas rates be "just and reasonable," 15 U.S.C. § 717c(a), concluding that *Texaco* would prohibit FEA's regulations' partial acquiescence in a free market price. I think that *Texaco* is simply inapposite on this point. As previously discussed, "equitable price" as used in the Allocation Act is merely *one* of many objectives that FEA is to provide for to the maximum extent practicable. "Just and reasonable" as used in the Gas Act is mandatory; rather than being one objective among many, it is *the* objective. The majority, to my mind, does not give proper weight to these fundamental distinctions.

On the basis of the aforementioned reasons, I would affirm the ruling of the district court in its entirety.

ROBERT P. ANDERSON, Judge, dissenting with whom HASTIE, Judge, joins.

Consumers Union of the United States, Inc. (Consumers Union) alleges in this action that regulations, 10 C.F.R.

§§ 212.71–74, effective January 15, 1974,[1] issued by the Federal Energy Office, now the Federal Energy Administration (FEA), violate § 4 of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751–756 (the Act) by creating, in effect, massive unauthorized exemptions from the Act; and, although § 4 of the Act imposes a mandatory duty to establish controls which will ensure "equitable" prices for all domestic crude oil,[2] the FEA, by permitting "new" and "released" crude oil to be sold at the free market price, has violated that duty.

The United States District Court for the District of Columbia denied Consumers Union's motion for declaratory and injunctive relief and granted FEA's cross-motion for summary judgment. It held that the Act does not necessitate price ceilings, and that FEA's decision to let the prices "float" on certain agency-created categories of crude oil satisfied the statutory prescription that it specify or prescribe a manner for determining price. The court further ruled that this decision did not result in an invalid exemption from regulation, because all oil remained "subject to" allocation and price controls. Consumers Union appealed from the decision and order of the district court.

A panel of this court, one judge dissenting, reversed that portion of the district court's judgment which held that FEA validly regulated the price of new oil, but affirmed the portion of the judgment which held valid the then applicable regulation governing released oil.[3] After a rehearing en banc a majority of the court now vacates the judgment of the panel and affirms the judgment of the district court. I respectfully dissent from the majority opinion and judgment as it relates to both new and released oil.

The majority concedes that the Act imposes a mandatory duty to "specify" or "determine," i. e. "regulate," prices for all crude oil. Section 4(a) of the Act[4] provides that the President of the United States ". . . shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil and each refined petroleum product, in amounts . . . and at prices specified in (or determined in a manner prescribed by) such regulation." It also specifies that the implementing regulation ". . . shall apply to all crude oil . . . produced in or imported into the United States,"[5] with the exception of "stripper well production," which is essentially the output of low-yield properties.[6] It further provides

1. The definitions of "old" crude oil, "new" crude oil and "released" crude oil, given in the majority opinion are not disputed.

2. 10 C.F.R. § 212.74(b) was amended effective August 29, 1974, 39 Fed.Reg. 31622–24 (August 30, 1974), so that released oil, like new oil, may now sell "without regard to the ceiling price [prescribed for old oil]."

3. 512 F.2d 1112 (Em.App.1975).

4. Section 4(a) provides:

"Not later than fifteen days after the date of enactment of this Act, the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. Subject to subsection (f), such regulation shall take effect not later than fifteen days after its promulgation. Except as provided in subsection (e)

such regulation shall apply to all crude oil, residual fuel oil, and refined petroleum products produced in or imported into the United States."

5. Although § 4(a) provides that a regulation promulgated for allocation and price ". . . shall apply to all crude oil . . . produced or imported into the United States," it is clear to all, except the most ignorant or most obtuse, that the Government of the United States, particularly the judicial branch, has no control over prices charged by the OPEC for its oil. If things remain as they are at present, a court faced with the question of the validity of import regulations for crude oil, must rule that it is not "practicable" within the meaning of § 4(b)(1) to require that imported oil be sold at a price lower than what the OPEC cartel managers demand for it.

6. Section 4(e)(2)(A) provides:

"The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United

that ". . . to the maximum extent practicable," the regulation secure ". . [the] preservation of an economically sound and competitive petroleum industry . . . equitable distribution . . . at equitable prices [and] . . minimization of . . . unnecessary interference with market mechanisms." § 4(b)(1)(A–I).

To exempt any category of crude oil from the allocation and pricing system, the President must make specific factual findings which, together with the proposed exemption, shall then be submitted to Congress. The exemption takes effect within a specified period thereafter, provided that neither House meanwhile takes any action expressing its disapproval. Any exemption thereby created may remain valid for a period not in excess of 90 days. § 4(g)(2).[7]

The regulations in question established a "two-tier pricing system," which imposed a ceiling on one category of crude oil while permitting other categories to sell *at the market price.* Specifically, "old" oil cannot be sold at a figure which exceeds the highest posted price for the same grade of crude oil in that particular field on May 15, 1973, plus $1.35. The national average ceiling price for old crude, which constitutes approximately

60% of domestic production, is $5.35 per barrel.

Under the objectionable regulations, 10 C.F.R. § 212.74(a); 10 C.F.R. § 212.-74(b), as amended at 39 Fed.Reg. 31622–24 (Aug. 29, 1974),[8] new and released oil may be sold "without regard to the ceiling price," i. e. at the market price. If a particular property did not produce at all during the base year, then all of its current yield is new oil and, accordingly, may be sold at the market price. The prevailing national average price for new and released oil is approximately $10 per barrel.

It is my opinion that these regulations create exemptions, although the statutory prerequisites, set forth in § 4(g)(2) for establishing exemptions, were not followed or complied with. The majority, on the contrary, assert that they do not, and that permitting new and released oil to float to market level is, in effect, providing regulation within the meaning of the statute. This is the first and principal issue on appeal. The second is whether allowing new and released oil to float to the free market price, is a violation of the FEA's mandatory duty to establish equitable prices for *all* crude oil.

In the light of the conclusion which it reached, the majority did not find it nec-

States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well."

7. Section 4(g)(2) provides:
"If at any time after the date of enactment of this Act the President finds that application of the regulation under subsection (a) to crude oil, residual fuel oil, or a refined petroleum product is not necessary to carry out this Act, that there is no shortage of such oil or product, and that exempting such oil or product from such regulation will not have an adverse impact on the supply of any other oil or refined petroleum products subject to this Act, he may prescribe an amendment to the regulation under subsection (a) exempting such oil or product from such regulation for a period of not more than ninety days. The President shall submit any such amendment and any such findings to the Congress. An amendment under this paragraph may not exempt more than one oil or

one product: Such an amendment shall take effect on a date specified in the amendment, but in no case sooner than the close of the earliest period which begins after the submission of such amendment to the Congress and which includes at least five days during which the House was in session and at least five days during which the Senate was in session; except that such amendment shall not take effect if before the expiration of such period either House of Congress approves a resolution of that House stating in substance that such House disapproves such amendment."

8. The maximum allowable price for released oil, prior to the amendment of 10 C.F.R. § 212.74(b), was the lesser of the prevailing market price or the price derived from a formula made up of the base period production level, the May 15, 1973 posted price, the prevailing market price, and the amount by which the then present production exceeded the base period yield.

essary to discuss what the Government argued, and the district court held, that new and released crude oil have not been exempted from price controls because FEA has retained the authority to impose more direct controls in the future.

This argument would be valid if the Act merely authorized the regulation of prices when or if the FEA, in its discretion, saw fit to do so, because in such a case, the failure presently to exercise that authority would not preclude the future imposition of controls. If, however, the Act *requires* that prices be regulated, any failure so to act, no matter how temporary, exempts present prices from the controls to which they should otherwise be subject.

The Act, by the use of such terms as "shall" and "direct," imposes a mandatory, non-discretionary duty to specify, or prescribe a method for regulating prices. See, *e. g. Escoe v. Zerbst,* 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935); *Richbourg Motor Co. v. United States,* 281 U.S. 528, 534, 50 S.Ct. 385, 74 L.Ed. 1016 (1930); *National Treasury Employees Union v. Nixon,* 492 F.2d 587, 601 (C.A.D.C.1974). Section 2(b), for example, provides that "[t]he purpose of [the] Act is to grant to the President . . and *direct him to exercise* specific temporary authority to deal with shortages of crude oil . . . [This] authority . . . *shall be exercised* for the purpose of minimizing the adverse impacts of [such] shortages." (Emphasis added.) Section 4(a), moreover, specifies that "the President *shall* promulgate a regulation providing for the mandatory allocation of crude oil . . . at prices specified in (or determined in a manner prescribed by) such regulation . . ." And, § 4(a) further provides that ". . such regulation *shall* apply to all crude oil . . ." (Emphasis added.)

Congress, moreover, by including the specific and comprehensive requirements of § 4 (g)(2) has exhibited a clear policy of restricting and closely controlling any grants of exemptions.

In the face of such legislative intent and the clear and unambiguous meaning of the Act, any interpretation of the Act which would permit the Executive, acting through the FEA, to evade a non-discretionary duty and to enlarge the authority to create exemptions simply by describing as "subject to controls" that which may simply be determined by the forces of an uncontrolled market, must be rejected.

That the regulations at issue do not, in *haec verba,* state that they "exempt" the new and released oil from price controls is of no consequence when the operative effect of their provisions is exactly that. If these are not exemptions, what are? This literal approach, adopted by the district court, was rejected by the Supreme Court in *Federal Power Commission v. Texaco, Inc.,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). Insofar as FEA has not regulated prices in compliance with the Act, it has created a *de facto* exemption which is invalid to the extent that the detailed procedures set out in § 4(g)(2) have not been followed.[9]

The majority in support of its position leans heavily upon part (I) of § 4(b)(1) which provides that the regulation of the allocation and prices of crude oil shall, to the maximum extent possible, provide for "minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms;" and interpret this to mean that Congress intended thereby "to hew a sphere of responsibility within which FEA could decide how to proceed against the crisis;" and construe "the grant of such broad regulatory discretion" to empower the

---

9. Although the court below did not address the issue of compliance with § 4(g)(2), there would be no point in remanding the case because the record unequivocally shows that an exemption, to the extent that one has been granted, is no longer valid. Appellee Sawhill promul-gated the regulations at issue on January 15, 1974. 10 C.F.R. § 212.74(b) was amended effective August 29, 1974. Section 4(g)(2) provides that an exemption, even if validly granted, may remain in force for no more than 90 days, a period which has long since expired.

FEA to free any category of crude oil from all regulation without complying with the required exemption procedure. But the words used were "minimization," which implies some change in or affect upon economic operations, and "unnecessary interference," which implies some necessary interference with market mechanisms. This wording is hardly a justification for finding such a grant of the unlimited power as the majority would accord to the FEA. Concerning this provision the Conference Report, No. 93–628, at 24, U.S.Code Cong. & Admin. News 1973, p. 2701, said:

"Section 4(b)(1)(I) of the conference substitute requires special mention. This section emphasizes the objective of minimizing economic distortion, inflexibility and unnecessary interference in market mechanisms. The committee recognizes that *mandatory* allocation programs which compel the distribution and sale of fuels for particular uses *at specified prices necessarily distort* the *economy* and *interfere with a free market mechanism. It is the intent of this legislation that that economic distortion* and *interference* be minimized to the extent practicable."

While FEA has some discretion in working out the interplay of the nine goals of § 4 in devising a regulatory scheme, it cannot adopt measures which contravene statutory mandates. See, e. g. *Permian Basin Rate Cases*, 390 U.S. 747, 776–777, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Wisconsin v. Federal Power Commission*, 373 U.S. 294, 309, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942).

The paragraph out of which the above quoted portion is taken concerned the use of regulations for allocation and pricing of oil established under the Economic Stabilization Act, and the majority argues that, because the COLC under Phase IV permitted the utilization of free market prices for some petroleum products, it was the congressional intention that the Phase IV regulations under the Economic Stabilization Act would be adopted and used under the present Act, i. e. Emergency Petroleum Allocation Act of 1973. But this Act, although it several times makes mention of the Economic Stabilization Act with respect to § 203(a)(3), concerning allocation, see § 4(f)(2), § 6(a), and incorporates portions of that Act by reference, § 5(a)(1 and 2), it nowhere mentions or incorporates § 203(a)(1) which has to do with the fixing of *prices.*

The majority has culled-out of a portion of the Conference Report a single sentence which it has enlarged into a controlling provision of the Petroleum Allocation Act; and argues that the FEA is authorized to adopt the regulations promulgated by the COLC under the Economic Stabilization Act as a plenary system of regulation of prices under the Petroleum Allocation Act. There is not a shred of authority to be found in the Act to sustain this assertion as to the regulation of *price.* While the reports of congressional committees are helpful in disclosing legislative intent, the Act itself, which was subsequent to committee debates and reports, is also evidence of intent. It certainly cannot be ignored, as it is by the majority. To paraphrase an old adage, "what Congress in fact did speaks more loudly than what it said in its committees." The Act, of course, did not expressly prohibit the use by the FEA of such parts of the COLC's system of regulation as would unquestionably fulfill or implement the Act; and, as above mentioned, it referred to and incorporated some portions of them. But it is quite obvious that with respect to any use by the FEA of the Economic Stabilization Act, and the regulations under it, as precedent insofar as the regulation of prices was concerned, it was the congressional intention that such use be subject to the mandatory pricing controls implicit in the present Act and subject to the limitations and directions set out within it. Neither by this means nor by any other does the Emergency Petroleum Allocation Act, expressly or by implication em-

power the FEA to relieve various categories of crude oil from mandatory price controls.

The Senators and Congressmen who produced the Conference Report did not accept the Phase IV price controls under the Economic Stabilization Act as fixing, in toto, equitable prices for the Petroleum Allocation Act, as the majority claim. For example:

"The Committee is aware that Phase 4 oil regulations issued by the Cost of Living Council under authority contained in the Economic Stabilization Act of 1970, as amended, effectively prevented a passthrough of increased costs at the retail level—unless such increases resulted from price rises in imported products. Retailers of gasoline and heating oil were held to a base of January 1, 1973, upon which an allowable markup was permitted while producers and others in the distribution chain were permitted to markup on a May 15, 1973, cost base. The provisions contained in subsection (b)(2) would assure that, in exercising his authority under this bill, the President would not repeat similar inequities in the establishment of prices or methods for determining prices for gasoline and refined lubricating oil." *H.R.Rept. No.* 93–531, p. 20, U.S.Code Cong. & Admin.News 1973, p. 2597.

It is apparent that this point of view was shared by a majority of the other members of the House and Senate because the present Petroleum Allocation Act, as finally passed, contained the following mandatory provisions for specifying prices:

§ 4(b)(2) "In specifying prices (or prescribing the manner for determining them), such regulations shall provide for—

(A) a dollar-for-dollar passthrough of net increases in the cost of crude oil, residual fuel oil, and refined petroleum products to all marketers or distributors at the retail level; and

(B) the use of the same date in the computation of markup, margin, and posted price for all marketers or distributors of crude oil, residual fuel oil and refined petroleum products at all levels of marketing and distribution."

The purpose of these provisions was to insure, in the context of mandatory price controls, equitable prices all along the line, particularly for the benefit of the ultimate consumers of petroleum products. Just how these statutory requirements can be complied with, and the interests of the ultimate consumers can be preserved, when the first step in this chain of sales and distribution, that is, the price charged by the producer to the refiner for new and released oil in times of short supply, is permitted to float, is not answered or attempted to be answered by the majority. Moreover, § 4(e)(1) states, "[t]he provisions of the regulation under subsection (a) shall specify (or prescribe a manner for determining) prices of crude oil at the producer level . . . ," unless a prescribed exemption procedure is followed.

The majority's assertion that a regulation, which permits the price of a category of oil to float to the free market level fulfills the requirements of the Act, is untenable. Once the Commission permits the price to float, the price is not fixed by the Commission but by the vagaries and imponderables of the free market. The Commission cannot relegate the task of fixing prices to the action of the free market as "prescribing the manner for determining them," as the majority apparently would permit it to do.

The Commission, of course, might fix the prices for each and all of the categories of crude oil by relating them to market prices of a past date or a percentage above or below those market prices, but once the Commission has fulfilled its duties by regulating the prices there is no longer a free market and, therefore, no free market price.

It is also clear from the legislative history and the Act, itself, that Congress'

main objective in enacting the Emergency Petroleum Allocation Act was to require active administrative interference in the operation of the free market in order directly to affect the price of all crude oil (except stripper-well production). The House Committee ". . . [found] that . . . shortages [of crude oil and petroleum products] are real, severe, and cannot be dealt with through reliance on a free market structure . . ."[10], a sentiment echoed by the conferees:

> "[We] are in unanimous agreement that due to various factors the self-regulatory laws of supply and demand are not currently operating in the petroleum market. It is imperative that the Federal Government now accept its responsibility to intervene in this marketplace to preserve competition and to assure an equitable distribution of critically short supplies." *Conf. Rept. No.* 93–628 at 11, U.S.Code Cong. & Admin.News 1973, p. 2688.

Because the free-floating categories of crude oil would sell at the market price in the absence of any administrative regulation, the President has "permitted" it to sell at that price only in the sense that he has taken no action to compel a different result. If Congress intended that the market could be used as the exclusive regulator of prices, then there would have been no need to include regulation of prices within the Emergency Petroleum Allocation Act. If, however, they intended to leave price control to the discretion of the President, Congress would have adopted § 203(a)(1) of the Economic Stabilization Act; but the Legislative Branch did neither of these things. It enacted the Emergency Petroleum Allocation Act which requires mandatory price controls, and made it incumbent upon the President to regulate the prices of all crude oil, regardless of category.

The majority further maintains that, even conceding that the Act requires some form of active interference in the operation of the free market, the Act has been satisfied because governmental action causes the *average* price level for all crude oil to vary from that which would prevail in the absence of the two-tier system of controls. New and released crude oil, according to the majority normally constitute only a portion of the total output of each oil-producing property so that the average of the prices charged by each producer for *all* of his oil is lower than it would have been in the absence of the regulations at issue and that therefore FEA has in effect regulated the price for all crude oil.

Under that theory, a simple regulation governing the total amount any one producer could receive for his oil, be it "old," "new," "released" or otherwise would be adequate. But to be permissible, a scheme of indirect regulation must still meet the requirement that the Government affect the price for each category of crude oil and not just that of crude oil taken as a whole. A requirement to regulate the price of all crude oil, directly or indirectly, is not satisfied by an administrative scheme which affects only the average price of crude oil and not the price of each component category.

Although the Supreme Court upheld a regulation of the Federal Power Commission which indirectly controlled rates charged by natural gas producers, *Federal Power Commission v. Texaco, Inc., supra,* that case differed critically from the present case. The Natural Gas Act, 15 U.S.C. § 717, required that the Government regulate the rates charged by all producers. The administrative regulation, however, failed directly to regulate small producers of natural gas, even though they came within the scope of the Act. The Supreme Court upheld the validity of the regulation because the entire output of these small, non-regulated producers was purchased only by the pipelines and large natural gas companies which would exert pressure to keep

---

**10.** H.R. Report No. 93–531 at 6, U.S.Code Cong. & Admin.News 1973, p. 2583.

the freely floating rates in line with the "just and reasonable" rates to which the regulations compelled the larger producers to adhere. On the other hand, in the present case, the "average weighted price per barrel," is merely a mathematical construct with no moderating effect on the price of new and released crude oil, which is presently set exclusively by the operation of the "law" of supply and demand.

The conclusion that the regulations at issue do not regulate the prices of all categories of crude oil becomes clear when it is realized that, because new oil—defined as production per unit of oil-producing property in excess of 1972 production levels—is allowed to sell at the market price, there is a strong incentive to drill wells which were not active during the base period. As a result, situations will likely exist where producers have only new oil, which the regulations permit them to sell at the market price. Because the majority maintains that the price of all crude oil is regulated to the extent that the average price per barrel charged by each producer falls below the free market price, there will be situations in which the majority must concede that, under its own theory, the Government has failed to specify or prescribe a manner for determining price.

The Government and the majority seek to minimize the importance of this exemption by focusing on the "limited number" of properties producing only new oil. FEA does not indicate, however, how limited the number is. And, even if the number is quite limited, it would not cure the violation of the requirement that all crude oil be regulated. The majority, moreover, seeks to justify the exemption of new crude oil in part on the ground that the higher price will spur exploratory efforts. The number of properties producing exclusively new crude oil will remain limited only if the regulation fails to achieve its intended purpose. And, in case of such failure, FEA cannot invoke the incentive effect of market price as a justification for the regulation at issue.

Congress, in extending the Emergency Petroleum Allocation Act on December 5, 1974, specifically stated that FEA, in adopting the Phase IV system of price controls essentially unchanged, had failed to carry out the purposes of the Act.

*"[I]n several important respects the Congressionally defined objectives have been misunderstood, misinterpreted or, in some cases, ignored.* The Committee was dissuaded, however, from attempting to redefine Congressional intent through substantive amendment to the Act at this time. Instead, it was determined to wait until the next session of Congress when time would permit a more reasoned and detailed evaluation of the program . . . It *is the sincere hope and expectation of the Committee that the Federal Energy Administration . . will make the necessary revisions to bring the program in line with the firm intent of the Congress and the requirements of the law."* (Emphasis added.) H.R.Rept. No. 93–1443 at 2; see also, S.Rept. No. 93–1082 at 2.[11]

I am also of the opinion that 10 C.F.R. §§ 212.74(a) and (b) are invalid on the separate ground that the use of the market as the sole factor in determining the price of new and released oil fails to satisfy the statutory prescription that the price of all crude oil be set at an equitable level.

The majority concedes that the Emergency Petroleum Allocation Act requires price regulation so as to prevent price gouging or price discrimination.[12] Rather than one of the purposes of the Act, Congress clearly intended this as the major objective:

---

11. There was no conference report on Pub.L. 93–511, the statute which extended the Emergency Petroleum Allocation Act on December 5, 1974.

12. P. 1080 of appendix to present majority opinion.

". . . the bill . . . is not designed to and should not be interpreted as increasing supplies of these critically short products . . . Instead, this bill focuses on the short term objectives of seeing to it that . . . whatever limited supplies we have are equitably distributed throughout the nation to meet regional needs and preserve competition in the marketplace." *H.R.Rept. No. 93–531* at 6, U.S.Code Cong. & Admin. News 1973, p. 2583. See also, *Conf. Rept. No. 93–628* at 14.

The equitable price requirement is specifically designed to achieve this objective:

"The reference to equitable prices in the bill is specifically intended to emphasize that one of the objectives of the mandatory allocation program is to prevent price gouging or price discrimination which might otherwise occur on the basis of current shortages." *Conf.Rept. No. 93–628* at 26, U.S.Code Cong. & Admin.News 1973, p. 2702.

In subjecting producers to regulation for the major purpose of preventing price gouging or price discrimination, it is clear that Congress did not intend that "equitable prices," one of the requirements (the other being allocation) by which the objective was to be achieved, could be conclusively established by "the self-regulatory laws of supply and demand," which Congress found "are not currently operating in the petroleum market [in which] the Federal Government . . . [must] intervene . . to preserve competition and to assure an equitable distribution of critically short supplies." See, *Federal Power Commission v. Texaco, Inc., supra,* 417 U.S. at 394–97, 94 S.Ct. 2315.

The majority maintains that "utilization of free market price for [new and released crude oil] for a maximum of 27% of all crude petroleum production (excluding stripper-wells) is . . . a statutorily permissible means of accomplishing the necessary balancing of objectives." But free market price is clearly inequitable in the opinion of Congress, and the Act does not vest authority in FEA to set inequitable prices for any portion of domestic crude production. The Natural Gas Act's mandate of "just and reasonable" rates requires, as the Supreme Court's opinion in *Texaco* illustrates, precisely the same balancing of the same competing objectives of promoting new sources of supply and moderating consumer prices. And the Court there held that a two-tier pricing system under which one tier was determined by the market price exclusively was unlawful because, while the statute may have conflicting goals with respect to priorities, Congress did not authorize any exceptions to the requirement that all rates be "just and reasonable." *Federal Power Commission v. Texaco, Inc., supra,* 394–97, 94 S.Ct. 2315.

The majority finally maintains that "[the] elevation of one of the nine Congressional objectives . . . [§ 4(b)(1)(f)] to the level of a 'precept' is absolutely without support in the Act or its legislative history." [13] It is not the position of the dissent that FEA must disregard any of the goals of the Act, but that it must balance all the competing objectives of the Act in determining allocation and prices.

It is not the function of this court to determine what the equitable price is, or should be. It is my opinion that the President, through the FEA, by permitting the price of new and released crude oil to float at free market levels, has not struck any balance and, as a result, has failed to satisfy the requirement that prices be set at an equitable level.

JOHNSON, Judge (dissenting):

With the exception of the alternate ground urged for invalidating 10 C.F.R. §§ 212.74(a) and (b), to which I do not subscribe, Judge Anderson's dissenting opinion expresses my view of this case.

---

**13.** P. 1079 of appendix to present majority opinion.